**In the Interest of B.T., A Child.**

**No. 04–96–00109–CV.**

Court of Appeals of Texas,
San Antonio.

April 23, 1997.

Michael D. Robbins, San Antonio, for Appellant.

Thomas J. Crane, Daniel Thornberry, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before STONE, GREEN and DUNCAN, JJ.

## OPINION

GREEN, Justice.

Michael Thomas appeals from a jury verdict terminating the parent-child relationship between Thomas and his son, B.T. Thomas brings forward two points of error contesting the legal and factual sufficiency of the evidence.

### Facts

The Texas Department of Protective and Regulatory Services (the Department) first became involved in this case shortly after B.T.'s birth in September of 1989.[1] B.T. was born four months premature at home in San Antonio. The mother, Wendolyn Perryman,[2] and newborn son had to be rushed to Santa Rosa Hospital. B.T., weighing only two pounds, six ounces at birth, suffered from various medical problems. On September 30, 1989, the Department received a referral from the hospital concerning B.T.; it was reported that B.T. needed an emergency blood transfusion but the hospital initially could not locate the parents for their consent, and when it did contact Perryman, Perryman refused to give her consent until she spoke with Thomas. B.T. eventually received the transfusion, but only after an emergency court order was obtained. Neither parent visited B.T. while he was in the hospital. In November 1989, B.T. was discharged from the hospital and into the Department's care. The Department placed B.T. into a foster home in December 1989. The foster parents, Dan and Vicki Danielak, have cared for B.T. since then.

In May 1994, the Department filed a petition seeking to terminate the parent-child relationship between Thomas and B.T. Trial was by jury. In the court's charge, the court instructed the jury:

For the parent-child relationship between [B.T.] and MICHAEL THOMAS to be terminated, it must be proved by clear and convincing evidence that the parent has:

(1) Voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six (6) months;

(2) Knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; and

(3) Failed to support the child in accordance with his ability during a period of one (1) year ending within six (6) months of the date of the filing of this petition.

For the parent-child relationship ... to be terminated, it must be proved by clear and convincing evidence that the termination of the parent-child relationship is in the best interest of the child.

To the question "Should the parent-child relationship between MICHAEL THOMAS and [B.T.] be terminated?", eleven jurors responded "yes." As a result of the jury's finding, the court entered a decree ordering the termination of the parent-child relationship; in the decree, the court specifically noted:

The Court finds MICHAEL C. THOMAS has:

(1) Voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six (6) months.

The Court also finds termination of the parent-child relationship between the father, MICHAEL C. THOMAS, and the

---

1. Thomas disputes the exact date B.T. was born, contending it occurred on September 29, 1989 although other witnesses and the birth certificate confirm that B.T. was born on September 27, 1989.

2. Perryman was not a party to this lawsuit since she voluntarily relinquished her rights to B.T. in September of 1993.

child, [B.T.], the subject of this suit, is in the best interest of the child.[3]

Thomas filed a motion for new trial, which was overruled by operation of law. He then filed notice of appeal.

### Discussion

■ In two points of error, Thomas argues that the evidence was both legally and factually insufficient [4] to establish that Thomas voluntarily left B.T. alone or in the possession of another without providing adequate support of B.T. and remained away for at least six months.

### Standard of Review

■ Involuntary termination proceedings must be strictly scrutinized. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). Parental rights can only be terminated by a showing of clear and convincing evidence. *See* TEX.FAM.CODE ANN. § 161.001 (Vernon 1996); *In re G.M.*, 596 S.W.2d 846, 847 (Tex.1980). When an appellant challenges the factual sufficiency of the evidence, this court has previously held that the intermediate standard of review of clear and convincing will be used. *See Anthony v. Mays*, 777 S.W.2d 200, 204 (Tex.App.—San Antonio 1989, no writ); *In re T.M.Z.*, 665 S.W.2d 184, 186 (Tex.App.—San Antonio 1984, no writ).[5] In reviewing a jury's findings based on a clear and convincing standard, we ask ourselves whether sufficient evidence was presented to produce in the mind of a rational factfinder a "firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 1996); *In re G.M.*, 596 S.W.2d at 847.

■ In reviewing a legal sufficiency challenge, we must view the evidence in the record in a light which tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). The judgment will be reversed only when the evidence offered to prove a vital fact constitutes no more than a mere scintilla. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983); *see In re Baby Girl Rodriguez*, 940 S.W.2d 265, 270 (Tex. App.—San Antonio 1997, n.w.h.).

### Involuntary Termination

■ The trial court terminated Thomas' parental rights under section 161.001(1)(C) of the Family Code.[6] To terminate the parental relationship on this ground, the State must prove by clear and convincing evidence that Thomas (1) voluntarily left the child, (2) alone or in the possession of another, (3) without providing adequate support of the child, (4) remained away for at least six months, and (5) termination is in the best interests of the child. TEX.FAM.CODE ANN.

---

3. No one objected to the court's exclusion of the other two alleged grounds for termination in its decree.

4. Thomas' attorney conceded at oral argument that he had no reasonable expectation of reversal on the legal sufficiency claim; he thought, however, he was "ethically" required to bring such point of error forward on appeal. We note that if an attorney knows that he has no reasonable expectation of reversal on appeal, he should not bring forward that particular point of error unless he wishes to subject himself to sanctions. *See* TEX.R.APP.P. 84; *Campos v. Investment Management Properties, Inc.*, 917 S.W.2d 351, 356 (Tex.App.—San Antonio 1996, writ denied).

5. We recognize that the courts of appeal have disagreed over whether an intermediate standard of review should be used when reviewing termination proceedings. *See In re J.J.*, 911 S.W.2d 437, 439–40, 440 n. 1 (Tex.App.—Texarkana 1995, writ denied). However, because termination proceedings concern the "basic civil rights of man," "rights far more precious than property rights," *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), "[w]e do not believe the Texas Supreme Court intends to require trial courts to adhere to a higher standard of proof in termination cases while allowing the courts of appeals to use the same standard of review as in cases decided by preponderance of the evidence," *In re L.R.M.*, 763 S.W.2d 64, 67 (Tex.App.—Fort Worth 1989, no writ); *see* W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals*, 24 ST. MARY'S L.J. 1041, 1149 (1993) (clear and convincing standard applied in review of termination cases).

6. Because the 1995 amendments to the Family Code did not substantially revise the provisions applicable to the instant case, we refer to the current version of the Family Code. At trial, the parties, as well as the court, referenced the older version.

§ 161.001(1)(C), (2) (Vernon 1996); *Holick*, 685 S.W.2d at 20. In his brief, Thomas only contests the first three elements. He asserts that for the first three years of B.T.'s life he believed that Perryman had custody of B.T. and was preventing him from seeing his son. He contends that after 1992, he involuntarily left B.T. in the Department's custody because he was incarcerated during most of that time. He also claims that element three cannot be met since he was not court-ordered to pay child support and because he was unable financially to provide any support to B.T., especially while he was incarcerated.

At trial, the State first called Darlene Blaylock, a case worker for the Department, to the stand. Blaylock testified that after the Department began working on this case, on October 6, 1989 she went to visit Perryman concerning the allegations of medical neglect. She stated that Thomas was present at this meeting, but he refused to engage in conversation; nevertheless, she encouraged both parents to keep in contact with B.T. She also testified that neither parent visited B.T. while he was in the hospital nor were the parents available when B.T. was discharged.

The second witness for the State, Bonnie Doss, testified that she worked on the case from October 5, 1990 to June 17, 1991. During that time, Thomas did not contact the Department nor B.T. On behalf of the Department, she phoned Thomas and wrote to him several times to arrange a visitation schedule. Some of the letters were returned. Although the phone was working, she was only able to get through to someone once; a lady answered the phone and verified that Thomas did live at that number. Doss left a message for Thomas concerning B.T., but Thomas never returned the phone call.

Next, Marjorie Georg testified on behalf of the Department. She was the case worker from June 1991 to June 1993. She continued the Department's efforts to contact Thomas. Some of her letters were eventually returned stating that Thomas was not at that address. She then conducted a diligent search to find Thomas' address. After obtaining an address for Thomas from the Houston Police Department, she began sending letters to the newer address. She also called and spoke with Thomas' wife, Kathryn Thomas. Eventually, she was able to speak with Thomas over the phone in May of 1992; during the course of this conversation, Thomas related that he wanted his son and asked what he needed to do to get him. A visitation was scheduled and Thomas visited B.T. around July 13, 1992. At this visit, Thomas promised to visit B.T. every two weeks and to attend physical therapy with his son. Thomas' next visit did not occur until September when Thomas made an unscheduled visit to one of B.T.'s Easter Seal therapy sessions. After that, Thomas had no other contact with his son.

Georg also testified that Thomas attended a staffing meeting held by the Department. Georg claimed that termination of Thomas' parental relationship was discussed at the meeting. During the meeting, Thomas then requested that his home be studied for permanent placement of B.T. Later, a home study was attempted but Thomas asked the Department to postpone the study until January because it was not a good time in his life right then. Georg sent Thomas a letter confirming the cancellation of the study and requested that he seek a home study no later than January 31, 1993. Thomas also had suggested to Georg that the Department consider placing B.T. with Thomas' father; the Department contacted Thomas' father but he refused the home study and argued that he was automatically entitled to custody of B.T. since he was the grandfather. Georg sent Thomas a letter regarding his father's refusal to permit a home study. Thomas never responded to these letters and never requested another home study.

Georg also swore that the foster parents, the Danielaks, had given their phone number to Thomas and had encouraged him to call and speak with B.T. She opined that Thomas knew that B.T. was in the State's custody, knew what to do to contact his son, but did nothing.

The next witness to testify, Lisa Lagendre, represented that she had been the case worker for B.T. since June of 1993. She sent a letter to Thomas notifying him that she was the new caseworker; this letter was not re-

turned. All other letters were returned. In fact, all of the certified letters were returned as unclaimed. She was able to verify Thomas' address through other means and determined that she had the correct address. Eventually, she found Thomas; she first met Thomas on April 18, 1995 while he was incarcerated in the Bexar County jail. She discovered that he was there through his attorney. This attorney also verified that the address that Lagendre had been using to correspond with Thomas was correct.

Lagendre claimed that Thomas never attempted to contact B.T. prior to the present suit. The only letters that Thomas ever sent to B.T. were written after May 1995, that is, after the present termination suit was initiated.

Next on the witness stand was Thomas' probation officer, Wayne McCurry, who testified regarding the dates in which Thomas was in jail.

After McCurry's testimony, Dan and Vicki Danielak each took the stand to relate that Thomas visited B.T. at a therapy session three years ago and at least one other time. Vicki testified that Thomas brought some clothes for B.T. on one visit and small gifts for B.T. on the other visit. Besides these two visitations, Thomas never called, sent letters, or attempted any contact concerning his son prior to the present suit even though the Danielaks had provided him with their phone number. Dan testified that Thomas attended a staffing meeting in which the termination of Thomas' parental relationship was discussed.

Greg Pape, the supervisor in the Department, also testified. He testified that the first documented visit between Thomas and B.T. occurred in the summer of 1992. He asserted that Thomas clearly knew that the Department had custody of B.T. since at least June 1992. He claimed that Thomas was present at the Department's staffing meeting held in October of 1992 and that he gave explicit instructions to Thomas concerning what Thomas needed to do to be able to keep his child. He warned Thomas that if

the instructions were not followed, the Department would seek to terminate his rights.

Perryman also took the stand at trial. She swore that Thomas knew that B.T. was with the Department since Blaylock's first visit in October 1989. She also claimed to have told Thomas in 1990 that the Department had custody of B.T.

When Thomas himself testified, he stated he had two other children by Perryman and conceded that at one point he was under court order to pay child support for these other two children.[7] Regarding B.T., he admitted to never visiting B.T. in the hospital but claimed to have called the hospital to check on Perryman and B.T. the day B.T. was born and maybe the next day as well. He claimed that prior to 1992 he never knew that B.T. was in the Department's custody because Perryman lied to him concerning the whereabouts of B.T. He testified that Perryman told him she had custody of B.T. but refused to let Thomas see him.

He reported that the Department first contacted him concerning B.T. in July 1992 and during that phone conversation, he maintained that he wanted his son and would attempt to visit twice a month. He noted that he had met with B.T. only twice. Thomas also admitted to being at the staffing meeting in October of 1992 but denied that any discussion concerning termination of his rights occurred. He testified that he was working two jobs during this period.

While on the stand, although swearing that he never received any letters from the Department, he verified that the address that the Department had been using was correct.

Thomas also testified as to the dates that he was imprisoned. He received ten years deferred adjudication in August 1991. He was arrested in July 1992 after a motion to revoke was filed but released on August 11, 1992 when the motion to revoke was denied. He was arrested for misdemeanor charges in February 1993 but was released on bond. A second motion to revoke was filed in Novem-

---

7. At trial, he asserted that he was ordered to pay $150 a month. The court order specified he was to pay $100 a month for each child. Both Perry- man and Thomas testified that he did pay child support for these other two children.

ber 1993. He was jailed from January 28, 1994 to July 1994. A third motion to revoke was finally granted and Thomas was arrested on August 28, 1994. He was still an inmate of the Bexar County jail at the time of the present trial. He gave testimony that the revocation of his probation was currently on appeal and virtually guaranteed that it would be reversed; as a result of the revocation, he testified that he was serving a ten year sentence.

He claimed to have been out of jail between August 1992 and November 1993 and admitted to not attempting to contact the Department or the Danielaks concerning B.T. during the times he was incarcerated or during the times he was free.

 Based upon the evidence adduced at trial, a rational jury could have formed a firm belief that Thomas did not support B.T. Thomas avers that, pursuant to *Wetzel v. Wetzel,* 715 S.W.2d 387 (Tex.App.—Dallas 1986, no writ), he was excused from supporting B.T. since he was not under court order to pay child support. We decline to follow the language in *Wetzel* since section 151.003 of the Family Code makes it clear that a parent has a duty to support his child. *See* TEX.FAM.CODE ANN. § 151.003(a)(3) (Vernon 1996). This duty of support exists regardless of whether a parent is court-ordered to support the child or not. *In re A.D.E.,* 880 S.W.2d 241, 246 (Tex.App.—Corpus Christi 1994, no writ); *Curton v. Gordon,* 510 S.W.2d 682, 685 (Tex.Civ.App.—Austin 1974, writ ref'd n.r.e.); *Homfeld v. Pence,* 487 S.W.2d 224, 227 (Tex.Civ.App.—El Paso 1972, no writ); *Alexander v. Clower,* 486 S.W.2d 189, 192 (Tex.Civ.App.—Tyler 1972, no writ); *Laslie v. Cole,* 465 S.W.2d 811, 813 (Tex.Civ. App.—Corpus Christi 1971, no writ). Moreover, occasional gifts are insufficient to fulfill a parent's obligation of support. *In re A.D.E.,* 880 S.W.2d at 246; *Homfeld,* 487 S.W.2d at 228. Thus, Thomas' occasional, small gifts to B.T., the only things he ever provided B.T., were insufficient to meet his support obligation, especially considering Thomas' testimony that he worked at two jobs during the period he was out of jail.

 The jury also could have found that Thomas knew the Department was involved with B.T. since October 1989 or at least since the summer of 1992 when Thomas admits to first receiving knowledge of the Department's involvement. Thomas claims in his brief that he did not voluntarily leave B.T. with the Department since he was in jail most of the time. Mere imprisonment does not constitute intentional abandonment of the child as a matter of law. *Texas Dep't of Human Resources* v. *J.T.H.,* 700 S.W.2d 718, 720 (Tex.App.—Corpus Christi 1985, no writ); *Jordan v. Hancock,* 508 S.W.2d 878, 881 (Tex.Civ.App.—Houston [14th Dist.] 1974, no writ). However, imprisonment is a factor to consider along with the other evidence. *See Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 534 (Tex.1987); *Jordan,* 508 S.W.2d at 881.

The evidence presented at trial was sufficient to produce in the mind of the jury a firm belief that Thomas voluntarily left B.T. in the possession of the Department without providing adequate support and remained away for at least six months. Even if the jury did not believe Thomas knew of the Department's involvement with B.T. since B.T.'s surgery in October 1989, the jury had enough evidence before it to find that Thomas abandoned his child even after the summer of 1992 when Thomas first claimed to have knowledge of the Department's involvement. Thomas himself admitted that between September 1992 and May 1995 and again between August 1993 and February 1994 he did not attempt to contact B.T. or provide support for him. The only visits Thomas ever had with B.T., other than the day B.T. was born, occurred on July 13, 1992 and September of 1992.

Thus, over the course of more than one year, when Thomas was out of jail—August 1992 to November 1993—Thomas visited B.T. only two times and only provided B.T. with small gifts at a time when Thomas had two jobs. Although Thomas requested a home study in October 1992, he later canceled it, and the Department requested him to seek another one no later than January 31, 1993. It is undisputed that from the date that Thomas canceled the home study to the date the petition was filed in May 1994, a period well over six months, Thomas did not

attempt to contact B.T., the Department, or the Danielaks nor did he provide support to B.T. even during the time period in which he was out of jail. Because this evidence could have produced a firm belief in the minds of the jury that Thomas voluntarily abandoned B.T., Thomas cannot prevail on his factual sufficiency claim.

Additionally, in reviewing the evidence in a light most favorable to the verdict, we find that there was more than a scintilla of evidence to support the jury's verdict.

Thomas' points of error are overruled, and the judgment of the trial court is affirmed.