NO. 07-07-0199-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



JUNE 7, 2007


______________________________



KENDRICK JERMAINE FULTON, 1995 CHEVROLET BLAZER


VIN: 1GNDT13W1S2180389 TEXAS TAG: 5GN S11, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE


_________________________________



FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;



NO. 94,782-D; HONORABLE DON EMERSON, JUDGE


_______________________________




Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

MEMORANDUM OPINION


 Appellant, Kendrick Jermaine Fulton, filed a notice of appeal on May 15, 2007. He
did not pay the filing fee required under Rule 5 of the Texas Rules of Appellate Procedure
or file an affidavit of indigence in conformity with Rule 20.1. Nor did he file a docketing 
statement as required by Rule 32.1. By letter from this Court dated May 15, 2007, we
advised appellant the "filing fee in the amount of $125.00 has not been paid. Failure to pay
the filing fee within ten (10) days from the date of this notice may result in dismissal." Tex.
R. App. P. 42.3(c). The letter also directed him fo file a docketing within ten (10) days. 
Appellant has not filed a docketing statement, paid the fee as directed or filed an affidavit
of indigence. Accordingly, we dismiss the appeal. Tex. R. App. P. 42.3(c). 

 Mackey K. Hancock

 Justice






AN STYLE="font-size: 10pt">In re C.H., 89 S.W.3d 17 (Tex. 2002). Through them, and when
addressing a factual sufficiency complaint, we are told to determine whether, after
assessing the entire record, the evidence permits a factfinder to reasonably form a firm
belief or conviction about the truth of the State's allegations. In re J.F.C., 96 S.W.3d at
266; In re C.H., 89 S.W.3d at 25. Unlike the situation wherein the legal sufficiency of the
evidence is in question, our focus is not simply upon the undisputed evidence that supports
the verdict, but the disputed evidence as well. In re J.F.C., 96 S.W.3d at 266. Implicit in
the standard is our obligation to accord the factfinder the deference needed for it to fulfill
its role. In re C.H., 89 S.W.3d at 25-26. Furthermore, if the evidence is factually sufficient,
then, it is also legally sufficient. This is so because, logically, there cannot be "no
evidence" of record if the record contains enough evidence to enable the factfinder to
reasonably form a firm belief or conviction as to the existence of pivotal facts. 

 Application of the Standard

 Multiple statutory grounds warranting termination of the parent/child relationship
were submitted to the jury. Thereafter, the jury returned a general verdict and found that
Arredondo's parental rights should be terminated. Because the verdict was general, the
particular statutory ground allegedly warranting termination went unspecified. However,
we need not determine whether each ground enjoys the requisite amount of evidentiary
support. Instead, the decision may be affirmed if the evidence supports the existence of
one ground, In re S.F., 32 S.W.3d 318, 320 (Tex. App.--San Antonio 2000, no pet.),
assuming the State also proved that termination was in the best interest of the child. See
Tex. Fam. Code Ann. §161.001(1) & (2) (Vernon 2002) (stating that termination may be
ordered if the trial court finds, by clear and convincing evidence, the existence of a
statutory ground and that termination is in the best interest of the child).

 Next, among the grounds asserted by the State and presented to the jury is one that
permits termination if the parent has constructively abandoned the child who has been in
the permanent or temporary managing conservatorship of the Department of Protective
and Regulatory Services or an authorized agency for not less than six months and:

 (i) the department or authorized agency has made reasonable efforts to
return the child to the parent;


 (ii) the parent has not regularly visited or maintained significant contact with
the child; and


 (iii) the parent has demonstrated an inability to provide the child with a safe
environment . . . . 


Tex. Fam. Code Ann. §161.001(1)(N) (Vernon 2002). To determine whether the jury could
legitimately conclude that termination was warranted under this provision, we turn to the
record before us. 

 The children were three females aged four, two, and one on November 26, 2001;
the latter date was the day on which the Department of Protective and Regulatory Services
(CPS) took custody of them. At the time, they were under the care of their maternal great-grandmother because both parents were incarcerated. (2) The great-grandmother was
observed to be confused and unable to state the children's names, the name of their
mother, or the day of the week. She also did not know the name of the children's doctor,
when they had last seen one, what time the children ate supper, what time they went to
bed, or when they took baths. Furthermore, the caretaker had to ask the two-year-old child
for answers to the questions posed by the case worker, and it was noted that the four-year-old child did the cooking and cleaning while the two-year-old child took care of the one-year
-old child. 

 Upon removal from the household, the children were initially separated and placed
in foster homes. They were reunited several months later in the home of Brenda 
McCullough (and her husband), a cousin of the children's mother. The latter
recommended that they be placed in the care of Brenda. At the time of their placement
with the McCulloughs, one of the children had ongoing urinary tract infections which were
later corrected with surgery. Another child had been born with part of her arm missing. 
She is in the process of receiving a prosthesis, something that she did not receive before
placement with the McCulloughs. 

 Next, case worker Cynthia Johnson (Johnson) initially spoke to Arredondo in prison
on December 6, 2001. (3) At that time, he gave her the name and phone number of his
mother. Johnson left several messages at that number but the calls were never returned.
Subsequently, Arredondo was released to a halfway house on January 17, 2002. (4) Within
several days of his release, Johnson spoke with him about a plan of service and visitation
with his children. She twice arranged meetings with him to sign the plan of service but he
failed to attend, and she was unsuccessful in later attempts to contact him at the halfway
house. The next time Johnson spoke to Arredondo was on February 6 at a status hearing
for which appellant arrived two hours late. (5) Johnson went over the service plan at that time
but Arredondo "was really agitated" about it because he had classes and group meetings
to attend with respect to his probation. Subsequently, Johnson arranged a meeting
between Arredondo, his probation officer, and herself to discuss the plan of service and
determine how Arredondo could fulfill his requirements. Arredondo told her he "was not
going to jeopardize going back to jail by attending . . . CPS classes." He did not attend any
of the appointments or classes she arranged for him with respect to his plan of service, and
did not complete any of the items on the plan of service. (6) He also did not exercise any
visitation rights or provide any support for his children while he was out of prison. (7) 

 Arredondo's probation was revoked on April 30 for drinking alcohol, failing to abide
by the terms of his curfew, failing to report his arrest for driving with a suspended license,
failing to pay as ordered, and failing to attend his after care group. He was sentenced to
seven years imprisonment. Johnson met with Arredondo in jail in May and discussed with
him voluntary termination of his parental rights. She testified that he was amenable to that
solution. In July, she wrote him about the progress of his children, and he responded the
following month. At that point, he had changed his mind and wrote several letters
indicating he wanted to be a presence in his children's lives. The plan of service was
modified in October 2002 to account for his being unable to participate in some of the
classes, services, and visitation rights provided for in the first plan due to his incarceration. 
Johnson had no proof that appellant had completed any of the requirements of the new
service plan but could not say he had not done so. 

 Claudia Webb, a Court Appointed Special Advocate for the children, met with
Arredondo on April 15, 2002. At that time, Arredondo told her he thought the children
would be fine with the McCulloughs "forever." She met with him again on May 31 when
she questioned him as to whether he understood why the arm of one of the children was
undeveloped so that studies could be done to obtain a prosthesis. (8) He became very
agitated, jumped up, charged towards her, and walked out slamming the door. 

 Arredondo testified that he had never formally married the children's mother. They
had lived together intermittently at her great-grandmother's house. He claimed to have
worked at various jobs and that he provided for his children. However, the only time the
children did not live at their great-grandmother's house was for a few months after the first
child was born. The children had never lived with Arredondo alone, and the last time he
saw them was December 8, 2000. 

 Arredondo has lived at different times with his mother, his brother, his grandmother, 
and with the children's great-grandmother. He did not have medical insurance for the
children but thought they were covered by Medicaid at one time. He claimed to have
bought his children clothes and to have contributed to the purchase of food in the great-grandmother's household when he was not in prison. However, he admitted the child's
mother was on food stamps, and Brenda also testified that Arredondo lived with the great-grandmother without payment of any kind. Arredondo testified he did not know that the
great-grandmother was losing her mental abilities. 

 Arredondo was arrested on the charge of injury to a child in June 2000. He stayed
in jail for two or three months and was released on probation. On December 8, 2000, he
was arrested for violating his probation and was in jail until March 20, 2001, when he
transferred to a prison unit for SAFP. He was released again in January 2002 to the
halfway house and re-arrested in April for violating his probation. He stated he would be
eligible for parole in about six months. He testified he has been attending Alcoholics
Anonymous and Narcotics Anonymous in prison, but his parenting classes had not begun
yet. He denied ever stating that he would give up his parental rights. 

 Arredondo's mother testified that he told her that a relative was going to take the
children. However, she took no steps to find out where the children were. She also knew
after December 6, 2001, that CPS was involved but did not contact that agency. 

 Thus, there was ample evidence from which the jury could form a firm conviction
or belief that Arredondo abandoned his offspring and failed to adequately support or care
for them prior to incarceration, and that after his release from SAFP, he failed to take any
steps to regain custody of them, visit them, or support them. Furthermore, he voluntarily
committed acts which caused his probation to be revoked, thereby resulting in his re-incarceration. Although Arredondo professed a desire to be a part of his children's lives
and may be currently attending substance abuse counseling, the jury could reasonably
believe that appellant's actions when he was not subject to a restricted regimen within the
confines of prison walls spoke more convincingly of his abandonment of his children. See
In re B.T., 954 S.W.2d 44, 49-50 (Tex. App.--San Antonio 1997, writ denied) (holding there
was enough evidence to find the defendant abandoned his child when he claimed to have
knowledge of CPS's involvement, he admitted that for periods of two years and six months
he did not attempt any contact with his child, and from the date he canceled a home study
until the petition was filed, he did not attempt to contact the child or CPS or provide support
even when he was out of jail); Edwards v. Dept. of Protective & Regulatory Services, 946
S.W.2d 130, 137 (Tex. App.--El Paso 1997, no writ) (holding the evidence was legally and
factually sufficient to support a finding of abandonment when the defendant knew his child
was in the hospital but never visited or arranged for anyone to claim the child, never
voluntarily sought out his children despite the opportunity to do so, and the case worker
had to search for him). 

 There was also ample evidence from which a jury could form a firm belief that
reasonable efforts had been made to return the children to Arredondo but he did not
regularly visit them or maintain contact with them. Evidence of similar force also exists
illustrating that he made only minimal efforts to meet the requirements of his service plan 
after he had been re-incarcerated. See In re P. R., 994 S.W.2d 411, 416 (Tex. App.--Fort
Worth 1999, pet. dism'd w.o.j.) (holding the evidence sufficient to support a finding under
subsection (N) when the defendant routinely missed her counseling sessions, had at least
ten different jobs lasting only a short period of time, had lived at 13 to 17 different places,
attended only two anger management classes, attended no parenting classes, and only
visited her child sporadically which resulted in a lack of bonding between them); In re
B.S.T., 977 S.W.2d 481, 486 (Tex. App.--Houston [14th Dist.] 1998, no pet.), overruled in
part on other grounds by In re C.H., 89 S.W.3d 17 (Tex. 2000) (holding the evidence was
sufficient to support termination under subsection (N) when, after release from prison, the
defendant was advised of visitation but only visited with his children twice and made no
further efforts to be involved with them, and a case worker testified that all reasonable
efforts were made to return the children to the parents). 

 Additionally, evidence of record also exists illustrating that Arredondo was unable
or failed to provide a safe environment because of his vague and unstable employment
history, lack of a permanent residence when out of prison, failure to obtain proper medical
assistance for one child's urinary tract infections and a prosthesis for another child,
recurrent alcohol abuse, and failure to abide by the conditions necessary to stay out of
prison. In re P.R., 994 S.W.2d at 416 (holding there was a showing of an inability to
provide a safe environment because of living at 13 to 17 different places in the last year,
an unstable employment history, failure to obtain immunizations for the child, and use of
methamphetamines and marijuana the day before a court-ordered psychologist
evaluation). In summary, and without viewing the evidence in a light favoring the verdict,
we conclude that the disputed and undisputed evidence both favoring and disfavoring the
verdict permitted a reasonable factfinder to form a firm conviction and belief that the
requirements of subsection (N) were met. In other words, the verdict is supported by
factually sufficient evidence, and because it is, it is also supported by legally sufficient
evidence. 

 Arredondo argues that according to In re A.V., 57 S.W.3d 51 (Tex. App.--Waco
2001, pet. granted), rev'd on other grounds, No. 01-0706, 2003 Lexis 111 (Tex. July 3,
2000), §161.001(1)(N) is inapplicable when the parent is in prison. This is allegedly so
because when a parent is in prison, the State cannot show that it has made reasonable
effort to return the child to the parent (i.e. relinquish its custody to the parent), or that the
parent has not regularly visited or maintained sufficient contact with the child or the parent
has not demonstrated an inability to provide the child with a safe environment. While it
may be that both the court and the State so suggested in A.V., we disagree with the
proposition that §161.001(1)(N) "was never intended to apply to someone" in prison merely
because the parent is in prison. Id. at 62. Simply put, both the State and the court in A.V.
read §161.001(1)(N) too literally. Returning the child to the parent, per §161.001(1)(N)(i),
does not necessarily mean that the child has to be physically delivered to the incarcerated
individual. Not every person in prison has his or her child taken away by the State. Nor
is every person in prison unable to provide the child a good environment. Indeed, it is quite
conceivable that one in prison may still be able to do so by, at the very least, leaving the
ward in the capable hands of a relative, friend or spouse. See In re R.L.T., No. 07-02-0332-CV, slip op. at 3-4, 2003 Lexis 5289 (Tex. App.--Amarillo June 24, 2003) (wherein the
parent presented evidence that he could leave the child with a relative). If such could be
done, then it is conceivable that the State has the ability to relinquish its custody over the
youth and, thereby, effectively return the child to the incarcerated parent. At the very least,
we cannot say that incarceration renders that possibility impossible. And, it is simply a
"cop-out" (in the vernacular of the 70's) for anyone to conclude that prison ipso facto
prevents (or relieves) the parent from providing the child a safe environment. Again, the
incarcerated parent may be able to work through surrogates, such as relatives, spouses,
or friends, to fulfill that obligation. And, if he so arranges and those surrogates agree to
the arrangement, it is hard to deny that the parent has taken steps to provide or effectively 
provided a safe environment. To suggest otherwise would be to suggest that military
personnel cannot provide for their children because they may be assigned overseas to
combat duty. In that situation, family is often available to step in and help. The same can
be no less true when a parent is incarcerated. Nor can we say that incarceration renders
it impossible for the parent to maintain significant contact with the child. While the child
may not be able to live with the parent in a jail cell, it would seem that the parent could
nonetheless pursue a significant relationship with the offspring through, at the very least,
written correspondence. In sum, incarceration does not render sub-paragraph (N)
inapplicable simply because of incarceration. And, to the extent that the State and court
in A.V. and Arredondo suggest otherwise, we believe them to be wrong. 

Issue Two - Best Interest of the Children


 In his second issue, Arredondo contests the legal and factual sufficiency of the
evidence to support a finding that it was in the best interest of the children to end his
parental rights. We overrule the issue and conclude that the verdict enjoys the support of
both legally and factually sufficient evidence. 

 To help determine whether that jury finding has sufficient evidentiary support, we
turn to the record and consider what have become known as the Holley factors. These
factors, which have been mentioned by the Texas Supreme Court as insightful on the
issue, consist of: 1) the desires of the child; 2) the emotional and physical needs of the
child now and in the future; 3) the emotional and physical danger to the child now and in
the future; 4) the parental abilities of the individuals seeking custody; 5) the programs
available to assist these individuals to promote the best interests of the child; 6) the plans
for the child by these individuals or by the agency seeking custody; 7) the stability of the
home or proposed placement; 8) the acts or omission of the parent which may indicate that
the existing parent/child relationship is not a proper one; and 9) any excuse for the acts or
omission of the parent. Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976). However, we
must remember these are not the exclusive indicia which may be considered. In re C.H., 
89 S.W.3d at 27. For instance, evidence that proves one or more statutory grounds for
termination may also constitute evidence illustrating that termination is in the child's best
interest. Id. at 28. Moreover, one need not prove that each Holley factor favors
termination. Id. All one need do is present enough evidence from which the factfinder can
reasonably form a firm conviction or belief that the child's best interest warrants
termination. 

 Here, we have evidence that Arredondo 1) has an unstable employment history and
residency status, 2) was convicted of injury to a child, 3) violated the terms of his probation
on multiple occasions which eventually resulted in his incarceration, 4) has a substance
abuse problem, 5) failed to visit or support his children at a time when he was free to do
so and allegedly employed, and 6) failed to meet the requirements of his family service
plan. There is also evidence that the McCulloughs 1) want to adopt the children, 2) have
provided a stable and loving environment, 3) have attended to the medical needs of the
children which needs went unattended prior to their placement with the McCulloughs, and
4) have attended counseling with the children, sought individual counseling for the children,
and obtained all the counseling that has been suggested to them. The children have also
expressed a fear they will be taken from the home of the McCulloughs. From these facts,
one can reasonably deduce that Arredondo lacked the ability, skills or desire to care for his
offspring, that he failed to take advantage of programs to assist him in improving his
personal and parenting skills, that the children needed a stable home environment which
Arredondo could or would not provide, and that his acts or omissions indicated the lack of
a proper parent/child relationship. In short, and without looking at the evidence in a light
most favorable to the verdict, we conclude that both the disputed and undisputed evidence
favoring and disfavoring the verdict permits a reasonable factfinder to form a firm
conviction and belief that termination of the parent/child relationship was in the best
interests of the children. 

 Having found the evidence legally and factually sufficient to warrant termination and
that it would be in the best interest of the children to terminate the parent/child relationship,
we affirm the judgment of the trial court. 


 Brian Quinn

 Justice

1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code
Ann. §75.002(a)(1) (Vernon Supp. 2003). 
2. The mother voluntarily relinquished her parental rights, and the youngest child was born in the
penitentiary. 
3. Arredondo was in the Substance Abuse Felony Punishment Facility (SAFP). 
4. Arredondo's original conviction was for injury to a child. The child who was assaulted by Arredondo
was 14 years old but there was evidence he looked older. There was also evidence that Arredondo was
intoxicated at the time of the assault. 
5. Arredondo claimed he did not receive timely notice of the hearing and had to walk 22 miles to get
there. 
6. Under the plan of service, Arrendondo was to pay child support, maintain consistent visitation with
the children, complete a psychological evaluation, find appropriate housing, obtain support through Alcoholics
Anonymous and Narcotics Anonymous, obtain a drug and alcohol assessment, attend parenting classes,
participate in FAME training, and attend individual/family counseling sessions. 
7. Arredondo claims he was working while he was out of prison but his probation officer was unable to
verify his employment because he was allegedly paid in cash. 
8. There was some evidence it may have been the result of drug abuse by the child's mother during
pregnancy.