

# Fourth Court of Appeals

### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-21-00159-CV

### IN THE INTEREST OF D.D.V.

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2020PA00206
Honorable Linda A. Rodriguez, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:    Patricia O. Alvarez, Justice
Irene Rios, Justice
Lori I. Valenzuela, Justice

Delivered and Filed: September 1, 2021

AFFIRMED

On January 29, 2020, the Texas Department of Family and Protective Services ("Department") filed a petition to terminate appellant's parental rights as the mother of five-year-old D.D.V.[1]  D.D.V. was four years old when he was taken into the Department's custody.  The Department sought termination pursuant to multiple predicate grounds under Texas Family Code section 161.001(b)(1).  The bench trial commenced on April 1, 2021, following which the trial court terminated appellant's parental rights pursuant to Family Code section 161.001(b)(1), subsections (C) (leaving child alone or in possession of another without adequate support), (N) (constructive abandonment), and (O) (failure to comply with provisions of court order).  The trial

---

[1] The Department also sought to terminate the father's parental rights.  The father is not a party to this appeal.  To protect the identity of the minor child, we refer to the parties by fictitious names, initials, or aliases.  *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

court also found that termination of appellant's parental rights was in the child's best interest. On appeal, appellant challenges the legal and factual sufficiency of the evidence in support of the three predicate grounds and in support of the best interest finding. We affirm.

## STANDARD OF REVIEW

To terminate parental rights, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in section 161.001(b)(1), and (2) termination is in the best interest of the child. TEX. FAM. CODE §§ 161.001(b)(1-2), 161.206(a). The Family Code defines "clear and convincing evidence" to mean "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

We review the legal and factual sufficiency of the evidence under the standards of review established by the Texas Supreme Court in *In re J.F.C.*, 96 S.W.3d 256, 266-67 (Tex. 2002). Under these standards, the trial court as the factfinder is the sole judge of the weight and credibility of the evidence. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## PREDICATE GROUND FOR TERMINATION

Only one predicate act under section 161.001(b)(1) is necessary to support a judgment of termination in addition to the required finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). In addition to two other grounds, the trial court found that appellant "voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months." TEX. FAM. CODE § 161.001(b)(1)(C). Because we conclude the evidence supports a finding under subsection (C), we address only that section.

The Department received a report for D.D.V. in August 2019 regarding substance abuse in the father's home. Appellant was not living in the home at the time. D.D.V. was placed with a

paternal aunt while father worked services. Appellant provided the history of why D.D.V. was with the father. Appellant testified she and the father had temporary orders under which she was the primary caregiver, the father had visitation every other weekend, and the father paid child support. During this time, the father twice refused to return D.D.V. to her. The first time, the father kept D.D.V. for about a month because she had to "go to jail to finish her probation" and she let him take her son because she thought he would give D.D.V. back. The second time occurred in late July 2017 when D.D.V. was about eighteen months old. When asked if she tried to get her son back this time, she responded

> I would constantly ask him [the father] to give him back to me – I mean, try to communicate with him, but he would block me and change his phone number. He moved a couple of times and just constantly blocked me. And there was [sic] times he was letting me see my son through the camera, but he would never just want to give him back to me. And I asked him and asked him and asked him.

She said that, for approximately the next three years, she did not hire an attorney to obtain D.D.V.'s return because she did not have the money to do so. She said she discovered the neighborhood where the father was living and drove around trying to locate his house. Although she did not locate him, when she later was able to communicate with the father, he told her where to send clothing so she sent her son diapers, money, and "a lot of stuff." She said the father did not allow her to see her son and the police would not help.

The father's testimony differed from appellant's. He said he had primary care of D.D.V. for almost three years. The father disputed appellant's statement that she left D.D.V. with him because she had to go to jail to finish her probation. He explained:

> No. That's what she's saying, but the truth is she left the baby and the dad [appellant's father] called me and I went down there to go get him because he said he couldn't take care of him. She didn't. She just turned herself [sic] without anything to go get the baby. She just turned herself in just out the blue and [sic] not tell me nothing. The dad [appellant's father] called me.

. . .

The [appellant's] father had called me to go get the baby because he couldn't take of him because he had to work. She took it upon herself to turn herself in without letting me know. And I had told her, "Let me know if you're going to get locked up so I can go get the baby." But she didn't do that.

The father said that since 2017, although appellant knew where he lived, appellant never tried to see D.D.V. or get him back. He stated he would have had concerns about returning D.D.V. to appellant because the child was "behind" on his vaccinations and because of the domestic violence between appellant and her boyfriend. According to the father, appellant paid him no child support and provided diapers only once, which did not meet the child's needs.

Tashelle McCall, who became the Department caseworker on December 1, 2020,[2] testified the Department began family-based safety services with D.D.V.'s father after the August 2019 report. In January 2020, the father took D.D.V. from the home where D.D.V. was living under the safety plan; however, the child was later returned to the Department. About this same time, appellant contacted the Department about returning D.D.V. to her, but the Department had not yet assessed her current situation for the purpose of placing D.D.V. with her, and there was no dispute appellant had not seen D.D.V. in three years. McCall said appellant had not provided for the child in any manner—not money, food, clothing, shoes, or necessities. Based on the evidence, including McCall's testimony, the trial court terminated appellant's parental rights.

On appeal, appellant contends the father took D.D.V. from her custodial possession when he was about a year old and never returned him despite her asking the father to do so. She contends that although the father did not let her visit D.D.V., she sent him necessary items, diapers, and money. She argues that although she stayed away for three years, "the evidence shows [she] did not voluntarily leave the child behind with anyone," "the child was all but kidnapped", and she fulfilled her obligation to support the child.

---

[2] McCall is the second caseworker; she replaced the first caseworker who died.

As the trier of fact, the trial court was free to believe or disbelieve witness testimony. Appellant had no contact with D.D.V. for three years; the father claimed appellant never tried to see D.D.V.; and appellant contended her absence from the child's life was involuntary. The father testified appellant provided D.D.V. with nothing except diapers on one occasion and appellant testified she supplied diapers, money, and "a lot of stuff" with no evidence that she actually did so or how often. The "duty of support exists regardless of whether a parent is court-ordered to support the child or not." *In re B.T.*, 954 S.W.2d 44, 49 (Tex. App.—San Antonio 1997, pet. denied). "Moreover, occasional gifts are insufficient to fulfill a parent's obligation of support." *Id.*

We conclude the evidence presented at trial was sufficient to produce in the trial court's mind a firm belief that appellant voluntarily left D.D.V. in the possession of the Department without providing adequate support and remained away for at least six months. Therefore, the evidence is legally and factually sufficient to support the trial court's finding on subsection (C).

## BEST INTEREST

In Texas, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "A best interest finding, however, does not require proof of any particular factors." *In re A.B.*, 04-21-00051-CV, 2021 WL 3174411, at *4 (Tex. App.—San Antonio July 28, 2021, no pet.) (mem. op.). In determining whether the child's parent is willing and able to provide the child with a safe environment, the factors set out in Family Code section 263.307 should be considered. *See* TEX. FAM. CODE § 263.307(b).[3] In addition to these statutory factors, in considering the best interest of

---

[3] These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the

the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[4]

"Neither the statutory factors nor the *Holley* factors are exhaustive, and '[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest.'" *A.B.*, 2021 WL 3174411, at *4 (citation omitted); *see also In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Additionally, evidence that proves a statutory ground for termination is probative on the issue of best interest. *C.H.*, 89 S.W.3d at 28. Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

On appeal, appellant argues the evidence is legally and factually insufficient to support the trial court's best interest finding. She contends that, aside from periodic therapy, there was no evidence to show D.D.V. will need an excessive amount of services in the future or that she would be incapable of tending to such needs. She also claims the evidence at trial shows she is the primary caregiver for her two other children living in her home, there was no evidence presented

---

child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[4] These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley*, 544 S.W.2d at 371-72.

regarding her parental abilities or deficiencies, and she was a non-offending parent at the onset of this case. Appellant asserts her own acts or omissions were irrelevant to the Department's investigation or decision to remove D.D.V. from his home, and the Department disregarded her actions prior to removing the child. For example, she contends she requested D.D.V. be placed with her, and rather than abide by its obligation to reunite the parent with the child, the Department opted for removal from the beginning. She argues the Department failed to adequately investigate her or assess her home as a placement option for D.D.V. and the Department abandoned its obligation to make reasonable efforts to return D.D.V. to her by removing D.D.V. from his father and placing him into foster care rather than with her. We disagree.

McCall testified that after the initial call to the Department, D.D.V. was taken into the Department's custody. In January 2020 when the father took him from his safety placement in the home of D.D.V.'s paternal aunt:

> He had the child out around probably 7:30 at night and we had to locate him because he was refusing to meet with us essentially, so we found him walking down the side of General McMullen with the child. And it was fairly cold weather and the child was not dressed appropriately and I was concerned that dad was under the influence at the time.

When asked if the Department had any concerns about appellant that made it inappropriate to place D.D.V. with her, McCall stated appellant "didn't really communicate with the Department very well – hasn't throughout the life of the case to assess her and hasn't began [sic] to work any services. She wouldn't allow us to assess her appropriateness." McCall said there were also concerns about appellant's "significant CPS history" and her criminal history involving assault, possession of marijuana, theft of property, criminal trespass, and being on probation multiple times. Regarding appellant's history with the Department, McCall said appellant had eleven investigations indicating she was neglectful of her children, as well as allegations of physical abuse and multiple family-based cases where she was working services.

McCall believed her first contact with appellant was on February 12, 2021, to discuss appellant's family plan services. McCall said appellant did not complete any drug tests; did not complete a substance abuse assessment, parenting or domestic abuse classes, or psychological recommendations; did not provide verification of housing or employment; and did not regularly visit D.D.V. Sometimes appellant had a reason for not engaging services and other times she had no reason. When temporary orders were originally granted, appellant was allowed weekly visits, but she visited with D.D.V. only nine to eleven times during the pendency of the case. McCall testified the few visits with appellant lasted ten to fifteen minutes and D.D.V. did not want to talk to her. He did not refer to appellant as "mom" and, on occasion, referred to her as "the lady."

According to McCall, appellant wanted D.D.V. placed either with her or with family. The Department had already contacted some relatives who were either unable or unwilling to take D.D.V. or did not return telephone calls.

Although appellant has two other children living in her home, McCall did not believe appellant demonstrated adequate abilities to care and provide for D.D.V. She believed it was in D.D.V.'s best interest that his parents' parental rights be terminated and that he be adopted by his foster mother. When asked the basis for her belief that appellant lacked adequate abilities to care and provide for D.D.V., McCall replied:

> Based on her refusal to work with the Department to show the Department that she is able to drug test negatively and engage in services and attend visits – provide the Department, you know, some amount of compliance. She has done absolutely nothing to indicate that she's interested in being a parent to [D.D.V.]

McCall stated D.D.V. was about four years old when he was taken into custody by the Department, he was non-verbal, developmentally delayed, was not potty-trained, and had medical and dental issues. The child is currently in a non-family foster-to-adopt home, receiving speech therapy through his school and privately, and attends behavioral therapy twice monthly. McCall

said D.D.V. has made significant progress since coming into custody, can have a conversation, is no longer considered developmentally delayed, and is potty-trained. D.D.V. has no neurological issues. She said D.D.V.'s foster home is meeting all his needs, he is thriving, and is very bonded with his foster mother whom he identifies as his mother.

D.D.V.'s foster mother, G.W., also testified. She said he was placed with her the evening of January 28, 2020, when he was four years and one month old, and, since that date, she has continually cared for him. Upon arrival, D.D.V. was wearing clothes and shoes that were too small, he was very dirty, his hair was not combed, and he was wearing a diaper. He was not vocal and answered questions with a yes or no. She said he was afraid to go to the park with her. She began to teach him colors, the alphabet, words like "refrigerator," and the names of foods. She introduced him to various activities, including puzzles. At first she thought he was not capable of learning, but he soon began to learn colors and numbers and songs. She also took him to physical therapy, occupational therapy, and speech therapy appointments. She said D.D.V. initially was evaluated at the level of an eighteen-month old, but his speech has now advanced to that of a four-year-old. She said physical therapy has helped him stop walking on his toes. He still has problems with occupational therapy because, when he first came into her care, he could not dress himself and "his whole body, his hands, everything, he didn't properly have the strength to actually hold on to the pencil straight or even play with blocks, things of that nature." Now he can do all those things, but they are still working on him being able to handle the small buttons on his clothes. She has moved from a two-bedroom apartment to a house with a backyard and close to a park, and enrolled him in pre-K school so that he can be around other children.

D.D.V.'s father said he did not want his parental rights terminated, but if they were, he was comfortable with the child staying with G.W. The child's guardian ad litem did not testify but

stated in closing she believed termination of the parents' parental rights was in D.D.V.'s best interest because he was thriving physically and mentally in G.W.'s care.

Mary Rosetti, a Department supervisor, testified that a family group conference was scheduled for March 13, 2021, where the Department attempted to meet with appellant to set up visitation and services, but appellant did not attend the meeting. She said that, although appellant confirmed she received her family plan services, appellant was discharged from multiple services throughout the pendency of the case because she failed to engage. She stated appellant was considered an "offending parent" because she failed to provide protection and safety for D.D.V. and failed to ensure the child was not removed by the Department.

Kristin Calvert, a Department investigation supervisor, testified that the night D.D.V. was taken into custody, the Department tried to contact appellant but was unable to reach her. Attempts to reach appellant the next day, including four visits to her home, were also unsuccessful and appellant did not allow anyone to come inside her house. Calvert stated:

> . . . There were concerns that there were other children in the home and that was the hesitation on her part, but we still were not able to get a global assessment of the residence she was residing in, so we were not able to say whether that was a safe place for [D.D.V.] to go to or not.

Contrary to appellant's arguments, we conclude the evidence is both legally and factually sufficient to support the trial court's best interest finding. D.D.V. was four years old when he came into the Department's custody suffering from physical and developmental deficiencies. The Department was unable to evaluate appellant due to her own lack of cooperation. The record indicates appellant has an extensive criminal history and history with the Department and she has not demonstrated the willingness and ability to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision. Having had no contact with D.D.V. for three years, appellant has not shown the willingness and ability to effect

positive environmental and personal changes within a reasonable period of time. Nor has she demonstrated adequate parenting skills, including providing D.D.V. with minimally adequate health and nutritional care; guidance and supervision consistent with his safety; care, nurturance, and appropriate discipline consistent with D.D.V.'s physical and psychological development; a safe physical home environment; an understanding of D.D.V.'s needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to D.D.V.

Furthermore, the evidence established G.W. can provide for D.D.V.'s present and future emotional and physical needs. G.W. demonstrated her parental abilities; that she sought out programs available to assist her in promoting D.D.V.'s best interest; and her home is stable. There was no evidence appellant could provide for D.D.V.'s present and future emotional and physical needs, and her criminal history and history with the Department indicated the existing parent-child relationship is improper.

We conclude the evidence presented at trial was sufficient to produce in the trial court's mind a firm belief that termination of appellant's parental rights was in D.D.V.'s best interest. Therefore, the evidence is legally and factually sufficient to support the trial court's best interest finding.

## CONCLUSION

For the reasons stated above, we overrule appellant's issues on appeal and affirm the trial court's judgment.

Lori I. Valenzuela, Justice